## Case No. 11,111.

### The PHOENIX.

### [3 Blatchf. 273.] 1

Circuit Court, S. D. New York. May 21, 1855.

COLLISION — BACKING INTO BERTH — STEADYING LINE—MAIN YARD SQUARED.

1. It is the duty of vessels lying in slips, in the port of New York, to brace up their yards, or top-lift them, during the night, and not leave them squared.

[Cited in The Avid, Case No. 678.]

2. Where a steamboat, in backing into her berth, in a slip in New York, in the night, became so wedged in as to make it necessary, to enable her to enter, to remove a lighter, which was fastened to a ship on the opposite side of the slip, and which lay between the steamboat and the ship: *Held*, that the hands on the steamboat, after the hands on the ship had failed, on being called on to remove the lighter, had a right to remove her themselves, and that there was no fault in their so doing, even though the removal of the lighter caused the main yard of the ship, which was squared, to come in contact with the smoke-pipes of the steamboat, as she backed, and broke them down.

3. The ship was in fault in leaving her main yard squared.

4. As the steamboat attempted to back in among a crowd of vessels, without having out a line by which to steady her, she was also in fault.

5. Under these circumstances, the loss was divided.

[Appeal from the district court of the United States for the Southern district of New York.]

This was a libel in rem, filed in the district court by Joseph W. Hancox, master of the steamboat Hero, against the ship Phœnix, to recover damages for an injury that occurred to the former in a slip on the North river, in the city of New York. The district court made a decree dividing the loss, on the ground that both vessels were in fault. [Case unreported.] The claimant appealed to this court.

Dennis McMahon, for libellant.

Charles Donohue, for claimant.

NELSON, Circuit Justice. The Hero was in the act of backing into the slip, to reach her berth on the south side of it, and which was the north side of pier No. 43, and next the foot of Spring street. There were two vessels lying at the entrance of the slip, on the same side of the pier. The Phœnix lay

1 [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

opposite, on the south side of pier No. 44, heading into the slip. There was also a lighter lying along side of the Phœnix, under her starboard bow. The entrance into the slip was thus contracted, making the manœuvres of the Hero somewhat difficult, in backing into her berth between the vessels, especially as the night was very dark. She became wedged in between the lighter and the vessels below; and, after the fastenings of the lighter had been slackened, and she had been moved further into the slip, so that the Hero could move, the main yard of the Phœnix came in contact with the smoke-pipes of the Hero, breaking them down, and smashing her wheel-house, besides doing other damage.

The ground of the complaint in the libel is, that the hands on board of the Phœnix improperly neglected to brace her yards, especially the main yard, which extended some ten or twelve feet over the side of the vessel, and occasioned the damage that occurred. The claimant denies that there was any negligence in not bracing the yards of the Phœnix, and also charges that the damage was occasioned by the mismanagement of the steamboat in backing into the slip.

There is some small contrariety in the evidence as to whether or not the main yard of the Phœnix was squared at the time the Hero attempted to back into the slip; and, also, as to whether or not the hands on board of the Hero, who were engaged in slackening the fastenings of the lighter and moving her, had not braced the yards of the Phœnix themselves, before the accident occurred. But the decided preponderance is in favor of the allegation that the yards were not braced but squared, and had been left in that situation by the hands on board of the Phœnix.

It is insisted on the part of the claimant, that it is customary for vessels lying in slips around this port to leave their yards squared during the night as well as during the day, and hence, that no negligence is properly chargeable for the omission to brace them up, or top-lift them. I think the weight of the evidence in the case is the other way. It is true that Schultz, one of the harbor-masters, says, that it is common for vessels to lie with their yards squared—more common than to lie with them braced or top-lifted. Whether he means while lying in slips in the night time, is not stated. And yet he admits that it is not a prudent thing for vessels to lie with their yards squared. Admitting this to be so, his duty as harbor-master should lead him to correct this practice of vessels, if, as he supposes, it prevails. Story, one of the port-wardens, says, that when vessels lie in slips where boats are continually coming in and going out, the custom is for them to brace their yards up, and that, when yards are squared, is where vessels lie at the wharves. Mount, a dock-master, on complaint being made to him against the Phœnix, gave orders to the mate on board, the day before the accident, that he must keep his yards braced sharp up

during the night time, while lying in the slip, because, when squared, they interfered with the steamboats that were continually passing in and out of it, by unnecessarily obstructing the passage. There can be no doubt about the duty of the Phœnix, after this direction by the dock-master, however it may have been before. In my judgment, the duty was equally obligatory without the direction, and should be generally observed by vessels lying in slips around the harbor, and should be enforced by the officers appointed to superintend and regulate the shipping lying within it.

It is said that the hands on board of the Hero had no right to interfere with the lighter, and that, if she had not been removed, the collision would not have happened, as the steamboat could not have backed far enough into the slip to have brought her smoke-pipes in contact with the main yard. I do not think so. After having called upon the hands of the Phœnix to change the position of the lighter, and they had refused to do so, those on board of the Hero were justified, under the circumstances, in making the change themselves. The crowded condition of the shipping at the docks and wharves around the harbor, must, of necessity, justify slight interferences of this description, for the convenience and accommodation of the business and commerce of the city. Undoubtedly, where it is practicable, a dock-master or harbor-master should be called in to enforce a proper spirit of accommodation. This could not be reasonably required under the circumstances of the present case; and no harm was done to the lighter.

I am satisfied, therefore, that the Phœnix was in fault, and would be responsible for the damage sustained, were it not that the hands on board of the steamboat were also in fault, for attempting to back into the slip among the crowd of vessels, without getting a line out to steady her. The want of this may have contributed to the accident, and, for this reason, the court below, adopting the rule where both vessels are in fault, divided the loss. I concur in this view, and shall therefore affirm the decree, with costs in this court.

PHOENIX. The (JONES v.). See Case No. 7,489.

PHOENIX CHEMICAL WORKS (NELSON v.). See Case No. 10.113.

PHOENIX FIRE INS. CO. (CADY v.). See Case No. 2,284.

PHOENIX INS. CO. (ALLISON v.). See Case No. 252.

PHOENIX INS. CO. v. The ATLAS. See Case No. 634

PHOENIX INS. CO. (BLAGG v.). See Cases Nos. 1.477 and 1.478.

PHOENIX INS. CO. (CLEMENT v.). See Cases Nos. 2,881 and 2.882.

PHOENIX INS. CO. (COPELAND v.). See Case No. 3,210.

PHOENIX INS. CO. (COSTER v.). See Case No. 3,264.

PHOENIX INS. CO. (DAVIDSON v.). See Case No. 3,607.

## Case No. 11,112.

PHOENIX INS. CO. v. ERIE & W. TRANSP. CO.

[10 Biss. 18; [1] 12 Chi. Leg. News. 89.]

District Court, E. D. Wisconsin. Nov., 1879.[2]

ADMIRALTY JURISDICTION—MARITIME SERVICE—BILL OF LADING—INSURANCE—STIPULATIONS—NEGLIGENCE.

1. The true test of what constitutes a maritime contract or service is whether it is to be substantially performed or rendered on navigable waters.

2. A contract was made for the shipment of grain from Chicago, by which it was agreed that the Anchor Line of propellers should carry the grain to Erie and there deliver it to the elevator company, as the agent of the consignee, for transhipment by rail to certain inland points in Pennsylvania. The bills of lading denoted a rate of freight charged for a continuous transportation service from the point of shipment to the inland points named, and provided that only that carrier should be liable for loss in whose actual custody the grain might be at the time of loss. *Held*, that in the case of loss while the grain was in the course of water transit, the court of admiralty had jurisdiction of an action against the propeller company.

3. A common carrier may, by contract with the shipper of goods, secure to itself, in case of any damage or loss to the goods, for which the carrier is liable, the benefit of any insurance to be effected by the shippers.

4. In such case the payment of a loss by the insurer to the shippers does not give the former any right of action against the carrier.

5. It was stipulated in bills of lading that the carrier should not be liable for loss by perils of navigation, and that in case of loss for which the carrier should be liable, he should have the benefit of insurance effected by the shippers. A loss occurred, the proximate cause of which was a peril of navigation, but the remote cause was the negligence of the carrier. The insurer having paid the loss to the shippers, it was *held* he was not subrogated to their rights against the carrier, and could maintain no action against the latter.

[Cited in The Hadji, 20 Fed. 877; The Roanoke, 8 C. C. A. 67, 59 Fed. 165.]

[Cited in Jackson Co. v. Boynston Mut. Ins. Co., 139 Mass. 511, 2 N. E. 103.]

This was a libel to recover for the loss of certain shipments of grain delivered on board the propeller Merchant, July 24, 1874, at Chicago, to be transported, so far as it was to be carried on the Lakes, to Erie, Pennsylvania.

At the time stated, libellant was a corporation of the state of New York, authorized to transact a general lake and inland insurance business. Respondent was a corporation of the state of Pennsylvania, authorized to carry

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court. Case unreported. Decree of circuit court affirmed by supreme court in 117 U. S. 312. 6 Sup. Ct. 750, 1176.]

on the business of lake transportation, and was the proprietor of a line of propellers running between Erie and Lake ports, designated as the "Anchor Line," one of which boats was the propeller Merchant.

On said 24th day of July, 1874, the Merchant received on board, at Chicago, 16,325.34 bushels of corn consigned to A. M. Wright & Co.; 800 bushels of corn consigned to Elmendorf & Co.; and 689.02 bushels of oats and 370.30 bushels of corn consigned to Gilbert Wolcott & Co. Bills of lading were issued for and on account of these several shipments, the parts of which acknowledging receipt of the grain, were as follows:

"Received, Chicago, July 24, of A. M. Wright & Co., the following packages (contents unknown), in apparent good condition: 16,325.34 bushels corn; order A. M. Wright & Co., Liverpool, Eng. Notify American Steamship Co., Philadelphia, Pa. Pro. Merchant."

"Received, Chicago, July 24, 1874, of Elmendorf & Co., the following packages (contents unknown), in apparent good condition; 400 bushels corn; order Elmendorf & Co. Notify Abm. Whitenack, Bound Brook, N. J. 400 bushels corn; order same. Notify same. Notify Wilkinson, Geddes & Co., Newark, N. J."

"Received, Chicago, July 24, 1874, of Gilbert Wolcott & Co., the following packages (contents unknown), in apparent good condition: 689.02 bushels white oats. 370.30 bushels No. 2 corn; order Gilbert Wolcott & Co. Notify Louis Buehler, Tamaqua, Pa. Pro. Merchant."

Material parts of the heading of these bills of lading were as follows: "Anchor Line. Lake and Rail via Erie and the Anchor Line Steamers from all Lake Michigan Ports. The Erie & Western Transportation Company is the proprietor of the 'Anchor Line,' which issues this bill of lading, and is a corporation of the state of Pennsylvania, having a real capital. The 'Anchor Line' is the authorized and exclusive agent of the Pennsylvania Railroad Co. for its lake business via the Philadelphia & Erie Railroad and connections. It offers to the public a line of first class propellers between the city of Erie and Lake ports. Responsible through bills of lading and the shortest lake and rail line to the East."

In the bill of lading, issued to Wright & Co., was the clause: "Rates from Chicago to Philadelphia, 16c. per bus.;" in that issued to Elmendorf & Co., "rates from Chicago to Bound Brook and Newark, 17c. per bus.;" and in that issued to Gilbert Wolcott & Co., was the clause, "rates from Chicago to Tamaqua, Pa., corn 17c., oats 11c. bush."

Each of these bills contained these further clauses:

"That the said Anchor Line and the steamboats, railroad companies and forwarding lines with which it connects, and which receive said property, shall not be liable * * *

for loss or damage by fire, collision, or the dangers of navigation while on seas, bays, harbors, rivers, lakes or canals. And where grain is shipped in bulk, the said Anchor Line is hereby authorized to deliver the same to the elevator company at Erie, as the agent of the owner or consignee, for transhipment (but without further charge to such owner or consignee) into the cars of the connecting railroad companies or forwarding lines, and when so transhipped in bulk, the said Anchor Line and the said connecting railroad company or carrier shall be, and is, in consideration of so receiving the same for carriage, hereby exempted and released from all liability for loss either in quantity or weight, and shall be entitled to all the other exemptions herein contained.

"It is further stipulated and agreed, that in case of any loss, detriment or damage done to or sustained by any of the property hereby receipted for during such transportation, whereby any legal liability or responsibility shall or may be incurred, that company alone shall be held answerable therefor in whose actual custody the same may be at the time of the happening of such loss, detriment or damage, and the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods."

On the day of shipment, the libellant through its agent in Chicago, made an insurance on the consignment to Wright & Co. of $8,000, on that to Elmendorf & Co. of $520, and on that to Gilbert Wolcott & Co. of $700.

The Merchant, laden with the grain covered by these bills of lading, left the port of Chicago July 24th, and proceeded on her voyage to Erie. Having reached a point about ten miles south of Milwaukee, she was on the next day, at about nine o'clock in the morning, stranded in a fog on the west shore of Lake Michigan. By reason of this event, there was a total loss to the shippers of these several shipments of grain. Notices of abandonment were given to the insurance company, and on claim made, libellant paid to the several shippers the amounts of insurance on their respective shipments as and for a total loss.

The libel alleged that these shipments of grain were placed on board the Merchant, to be carried to Erie and there delivered for the shippers for transhipment; that the loss did not occur by reason of fire, collision, or the dangers of navigation, but was occasioned by the unseaworthiness of the vessel, and unskillfulness, carelessness and negligence in her conduct and management while on her voyage; and that by payment of the insurance on said shipments, libellant became subrogated to all the rights, interests and rights of action of the assured against the carrier. It was also alleged that these shipments of grain were in fact wholly lost, except about 5,188 bushels, which quantity was brought into the port of Milwaukee in a perishable condition,

and unfit for transhipment, and was sold by respondent for $1,037.60.

The suit being in personam, and the respondent being a corporation of another state, service was obtained by process of attachment levied upon a vessel of the Anchor Line found within the jurisdiction of the court, as authorized by the rules in admiralty.

The answer put the libellant upon proof of various allegations in the libel, and denied that the loss was occasioned by unseaworthiness of the propeller, or the unskillfulness, mismanagement, carelessness or negligence of respondent, or of any of its officers, agents or servants.

It was alleged that the propeller was seaworthy, and that the loss occurred by a peril of navigation, without any fault of the vessel, or any fault, negligence or want of skill on the part of those in charge of her.

As an affirmative defence it was alleged that at the time of the loss, the grain covered by the bills of lading was in the actual custody of the respondent, which was the carrier thereof, and that if any liability arose on account of the loss (which was denied), respondent was, the company and carrier alone answerable therefor, and therefore, that by the provisions of the bills of lading, respondent became entitled to the full benefit of the insurance on the grain; and so, that no action could be maintained by libellant against respondent, on account of the loss.

A further defence interposed was that the court had no jurisdiction of the subject-matter of this action; and the ground of this defence was that by the bills of lading the grain in question was to be transported by respondent by boat, railroad companies and forwarding lines to points and places in the states of Pennsylvania and New Jersey, viz.: Philadelphia, Tamaqua, Bound Brook and Newark; that it was understood and agreed by the parties that part of the transportation should be performed on land and by means of railroad cars, and that, therefore, the alleged causes of action set out in the libel were not causes of admiralty jurisdiction.

Van Dyke & Van Dyke and N. J. Emmons, for libellant.

W. P. Lynde and George P. Hibbard, for respondent.

DYER, District Judge. Upon the issues made by the pleadings, three questions arise, which were very fully and ably argued at the bar [as the principal questions in the case]:[3]

1. Has the court jurisdiction of the subject-matter of this action?

2. If the court has jurisdiction, and the case is to be considered on its merits, was the loss occasioned solely by a peril of navigation, or by the unseaworthiness of the vessel or the negligence and unskillfulness of those in charge of her, either in connection with, or in the absence of such peril?

[3] [From 12 Chi. Leg. News, 89.]

3. Is the respondent entitled to the benefit of the insurance in this case?

First. Upon the question of jurisdiction, the claim of the respondent is, that the bills of lading were through contracts to carry the grain from Chicago to the several points inland, in Pennsylvania and New Jersey, by means of steamboats and railroads; that they were contracts made on land, to be performed on land by means of land carriage, in consideration of a single, entire through freight, which would be earned only on performance of the contracts, and that the contracts were, therefore, not maritime. It is true that the bills of lading denote a rate of freight for a continuous transportation service from the point of shipment to inland points in the states named; and to that extent they may be characterized as through contracts.

It is true, also, that part of this service was to be by rail, but the service to be performed by the Anchor Line was to be exclusively on water. The contracts were, that this line would carry the grain to Erie, and there deliver it to the elevator company.

As the agent of the consignee for transhipment, this line, as the bills of lading indicate, was but the agent of the connecting railways, and it would seem that the contracts for carriage beyond Erie were made by respondent as such agent. Furthermore, the bills of lading expressly provide that of the several connecting carriers, only the one upon whose line a loss might happen, should be responsible therefor; consequently for a loss while the grain should be in course of land transit, the respondent would not be liable. The loss in this case happened while the property was in course of water transit between the points expressly designated in respondent's contracts, and was therefore a loss which, by the express terms of the contracts, the connecting carriers could not be made answerable. Although a single through freight was charged, the distinct and independent service to be rendered by respondent, or its line, was the carriage of the grain by water on one of its boats, from Chicago to Erie, and its service actually ended at that point; and although, under the contracts, the shippers might compel the connecting carriers to receive the grain and transport it to the points of consignment, it does not follow that the obligation of the respondent was to carry the grain further than to Erie, and there deliver it for transhipment. The provision in the bills of lading as to responsibility for loss, makes the contracts of carriage several with each carrier as to liability. The Pennsylvania Railway Company would not be liable for loss happening while the grain was in transit between Chicago and Erie, and respondent would not be liable for loss occurring while transportation service was being rendered between Erie and Philadelphia, Tamaqua, Bound Brook and Newark. The obligation of the railway company to receive the grain and transport it to inland points would arise from the fact that its authorized agent, the

Anchor Line, had contracted in its behalf that it would so do, on delivery of the grain at Erie. The undertaking of respondent was not to carry the grain to inland points, because its liability as a carrier was restricted to its own route.

The point was made upon the argument that the contracts specify that the grain was to be transported until it had "reached the point named in this bill of lading." The provision, however, is not that the transportation service shall be wholly rendered by the Anchor Line, but the language is, "to be transported by the Anchor Line, and the steamboats, railroad companies and forwarding lines with which it connects, until 'the property' shall have reached the point named in this bill of lading."

Various illustrations were put by the learned counsel for respondent as tests of admiralty jurisdiction. They are more ingenious than sound. A contract to build a ship is not a maritime contract. A contract for her towage is. It is supposed that a contract is made to build a ship in Milwaukee and to tow her to Detroit, and there deliver her for a whole sum, and it is asked if a court of admiralty would have jurisdiction of a cause of action founded upon a breach of the contract to tow the ship to the place of delivery. Concede, for the purposes of the illustration, that it would not, and if not, the reason is obvious, namely, that the towage service in such a case would be the mere incident of the principal thing, which would be the building of the ship, and of this principal subject-matter of the contract a court of admiralty would have no cognizance. Again, it is supposed that a railroad company has contracted to carry property from New York to St. Louis, and that by the negligence of servants upon a steam ferry boat belonging to the company upon the Detroit river, the property should be damaged, it is asked, whether an action in personam in admiralty could be maintained against the carrier. Again the answer is that if not, it would be because the transhipment or transfer by ferry would be merely incidental to the carriage of the property by land from New York to St. Louis, and no substantial part of the service was to be performed otherwise than on land.

The true test of a maritime contract or a maritime service is whether it is to be substantially performed or rendered on navigable waters. If it is, then it is of maritime character, and the court of admiralty has jurisdiction. If it is not, then jurisdiction is disclaimed. That a very substantial part of the service to be performed under these contracts was to be performed upon navigable waters is not to be disputed. The loss happened upon these waters, while such service was being rendered, and under the construction of the contracts before given, and by virtue of the principle last stated, I cannot doubt that a court of admiralty has jurisdiction of the subject-matter of this suit.

Second. To what was the stranding of the propeller attributable? Did it arise solely from a peril of navigation, or was there co-operating negligence? (Upon a review of the facts which this question involved, it was held by the court that there was negligence on the part of the master and mariners who were navigating the vessel at the time, and that although a peril of navigation was the proximate cause of the loss, the remote cause was such negligence.)

The last, and more difficult and interesting question remains to be considered, namely: Is the respondent entitled to the benefit of the insurance in this case?

The various grounds upon which libellant urges its right to recover are:

1. That the loss in question was occasioned by the negligence of the carrier; that therefore the shippers had a right of action against the carrier, notwithstanding the stipulations in the bills of lading limiting its liability; that the insurance company having paid the amount of the losses to. the shippers, became subrogated to their rights, and may therefore maintain its action against the carrier for the amount so paid, and the carrier cannot avail itself of the clause in the bills of lading giving to it the benefit of the insurance, the loss having resulted from its own negligence.

2. That it is not proven that the shippers affirmatively assented to the limitations of liability and special provisions contained in the bills of lading, and hence that such limitations and provisions are not part of the contract of shipment.

3. That the clause in the bills of lading limiting liability, including the provision in question, are wholly void, because of a statute of the state of Illinois [4]—where the contracts were made—which makes it unlawful for a common carrier to limit its common law liability safely to deliver property, by any stipulation or limitation expressed in the receipt given for such property.

The principal propositions urged in reply by respondent are:

1. That it clearly appears from the proofs, that the bills of lading, with all the clauses and stipulations which they contain, constituted the contracts between the carrier and the shipper under which the grain was shipped.

2. That the statute of Illinois referred to does not apply to bills of lading issued on account of shipments as in this case, and that in any event it is not controlling upon this court, the question involved being one of general commercial law.

3. That the stipulation giving to the carrier the benefit of insurance is valid, even though the carrier can not relieve itself from the consequence of its own negligence; that whether the losses in question arose from negligence or not, after the insurance company made payment to the shippers, they, the shippers, had no right of action against the carrier; that therefore there was no right to

---

[4] Rev. St. Ill. c. 27.

which libellant could be subrogated, and as a consequence, that no action will lie against respondent; in other words, that the stipulation in question displaced or destroyed the right, which might otherwise exist, of the insurance company on payment of the insurance, to proceed against the carrier for reimbursement.

Without going at large into the proofs upon the question, it will suffice to say that I think the bills of lading should be regarded as the contracts between the shippers and carrier under which the grain was shipped. It is true that the decisions in Illinois enunciate a very strict rule in relation to proof of affirmative assent to special conditions in such contracts,—a rule much stricter than is laid down by the supreme court of this state and some other courts.

But the proofs here are very satisfactory as to the shippers' understanding and knowledge of the character and contents of these bills of lading, and as to their acceptance of them with such knowledge of their character. The case is much stronger in that regard upon the facts, than Michigan Cent. R. Co. v. Mineral Springs Manuf'g Co., 16 Wall. 318, in which it was held that an unsigned general notice, printed on the back of a receipt, does not amount to a special contract limiting common law liability, though the receipt with such notice on it may have been taken without dissent. In this state it has been held that when such a contract is in the custody of the shipper, its due delivery and his assent to its terms, are to be presumed, and that the burden is upon him to obviate these presumptions by proof. But it is not, I think, necessary to go thus far in order to sustain these bills of lading as contracts assented to by the shippers. By affirmative evidence it is sufficiently shown that they were understood and accepted as contracts under which the shipments were made; and what transpired between the shippers and the agent of the carrier prior to the delivery of the grain on board, and the execution of the bills of lading, was evidently understood by the parties as only the usual preliminary negotiations and understanding in relation to the shipments, which were to be followed by consummated contracts in the form of bills of lading.

There has been much controversy in the courts as to the power of a common carrier to limit its common law liability by special contract. Since the cases of New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344, and York Co. v. Central R. Co., 3 Wall. [70 U. S.] 107, the question, dealt with independently of statutory regulation, has not been an open one in the federal courts; and the right of the carrier to restrict or diminish his general liability by special contract, has been re-affirmed in Michigan Cent. R. Co. v. Mineral Springs Manuf'g Co., 16 Wall. [83 U. S.] 318, and in Bank of Kentucky v. Adams Exp. Co., 93 U. S. 174.

It is equally well settled that a common carrier cannot lawfully stipulate for exemption from responsibility for the misconduct or negligence of himself or his servants. New York Cent. R. Co. v. Lockwood, 17 Wall. [84 U. S.] 357; Bank of Kentucky v. Adams Exp. Co., supra.

Upon finding the fact of negligence in navigating the vessel, it follows, therefore, in the case at the bar, that the owners of the cargo could have recovered against the carrier, notwithstanding the limitations of liability expressed in the bills of lading.

An insurer of goods lost while in course of transportation by a common carrier is entitled, after payment of the loss, to recover what he has paid by suit against the carrier. No right, in the absence of special contract to the contrary, is better established. The legal principles upon which this right rests are most clearly stated in Hall v. Railroad Cos., 13 Wall. [80 U. S.] 370, by Mr. Justice Strong, who says: "It is too well settled by the authorities to admit of question, that, as between a common carrier of goods and an underwriter upon them, the liability to the owner for their loss or destruction is primarily upon the carrier, while the liability of the insurer is only secondary. The contract of the carrier may not be first in order of time, but it is first and principal in ultimate liability. In respect to the ownership of the goods, and the risk incident thereto, the owner and the insurer are considered one person, having together the beneficial right to the indemnity due from the carrier for a breach of his contract, or for non-performance of his legal duty. Standing thus, as the insurer does, practically, in the position of a surety, stipulating that the goods shall not be lost or injured in consequence of the peril insured against, whenever he has indemnified the owner for the loss, he is entitled to all the means of indemnity which the satisfied owner held against the party primarily liable. His right rests upon familiar principles of equity. It is the doctrine of subrogation, dependent not at all upon privity of contract, but worked out through the right of the creditor or owner."

In Hart v. Western R. Corp., 13 Metc. (Mass.) 105, Chief Justice Shaw states the principle as follows: "Now, when the owner, who prima facie stands to the whole risk and suffers the whole loss, has engaged another person to be at the particular risk for him, in whole or in part, the owner and the insurer are, in respect to that ownership and the risk incident to it, in effect one person, having together the beneficial right to an indemnity provided by law for those who sustain a loss by those who sustain a loss by that particular cause. If, therefore, the owner demands and receives payment of that very loss from the insurer, as he may, by virtue of his contract, there is a manifest equity in transferring the right to indemnity, which he holds for the common

benefit, to the assurer. It is one and the same loss for which he has claim of indemnity, and he can equitably receive but one satisfaction. So that, if the assured first applies to the railroad company, and receives the damages provided, it diminishes his loss pro tanto, by a deduction from and growing out of, a legal provision attached to, and intrinsic in, the subject insured. The liability of the railroad company is, in legal effect, first and principal, and that of the insurer secondary, not in order of time, but in order of ultimate liability. The assured may first apply to whichever of these parties he pleases; to the railroad company, by his right at law, or to the insurance company, in virtue of his contract. But if he first applies to the railroad company, who pay him, he thereby diminishes his loss, by the application of a sum arising out of the subject of the insurance, to wit, the building insured, and his claim is for the balance. And it follows, as a necessary consequence, that if he first applies to the insurer, and receives his whole loss, he holds the claim against the railroad company in trust for the insurers. Where such an equity exists, the party holding the legal right is conscientiously bound to make an assignment in equity to the person entitled to the benefit; and if he fails to do so, the cestui que trust may sue in the name of the trustee, and his equitable interest will be protected."

Now, were it not for the stipulation contained in the bills of lading, giving to the carrier the benefit of the insurance, there would be no question of libellant's right to recover. And the precise point of inquiry is, what is the effect of that stipulation?

The perils insured against were generally "of the seas," and after enumerating various specific perils, such as fires, enemies, jettisons, pirates and the like, the policy provides that the insurance company "takes upon itself all other perils, losses and misfortunes that * * * shall come to the hurt, detriment or damage of the said goods and merchandise or any part thereof."

The question under consideration was to great extent argued by the learned counsel for libellant, upon the theory that to give to the carrier the benefit of the provision relating to insurance, would be to give effect to the limitation of its common law liability for the grain and its safe delivery contained in the bills of lading, even as against the carrier's own negligence. I do not perceive a necessary connection between the clause in the bills of lading limiting liability for safe delivery of the cargo, and the clause giving to the carrier the benefit of the insurance, nor that it follows that because the former cannot exonerate itself from liability for negligence, the latter clause may not be held valid. To give the carrier the benefit of the insurance it must be liable to the shipper for the loss. Liability must exist as a pre-requisite to a claim to the insurance. The agreement is, that if the carrier shall be liable for the loss, then he shall have the benefit of the insurance. And if it be correct to say that the validity of the stipulation relative to insurance is not dependent upon the validity of the clause which attempts to limit liability for the property, or, in other words, that the effect of the stipulation relating to insurance is not to defeat the obligation of the carrier to indemnify the owner against loss occasioned by its negligence, then it would seem that the Illinois statute does not bear upon the right of the carrier to contract with the shipper for the benefit of the insurance.

That statute provides: "Whenever any property is received by a common carrier to be transported from one place to another, within or without this state, it shall not be lawful for such carrier to limit his common law liability safely to deliver such property at the place to which the same is to be transported, by any stipulation or limitation expressed in the receipt given for such property." [5]

As will be observed, the prohibition here is against any limitation of common law liability safely to deliver the property; but this does not involve the right to stipulate for the benefit of the insurance in case of loss and liability. These clauses in the bills of lading are to be read as the application to them of legal principles requires, and so reading them, the provisions would in terms be that the carrier "shall not be liable * * * for loss or damage by fire, collision or the dangers of navigation while on seas, bays, harbors, rivers, lakes or canals," unless such loss or damage shall be occasioned by the negligence of said Anchor Line, its agents or servants. And, "in case of any loss, detriment or damage done to or sustained by any of the property hereby receipted for during such transportation, whereby any legal liability or responsibility shall or may be incurred * * * the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods."

Admitting, then, that the loss of the cargo resulted remotely from the negligence of the carrier, the question recurs, can that part of the contract which gives to the carrier the benefit of the insurance be enforced as a valid agreement? In the absence of such agreement, on payment of the whole loss by the insurer, the insured would hold their claim against the carrier in trust for the insurer. And if the agreement be valid, I think it follows that on payment of the loss by the carrier, the insured would hold their claim against the insurer in trust for the carrier; and further with this agreement in force, on payment of the loss by the insurer, the insured would have no right to go against the carrier, because the loss

---

[5] Rev. Stat. Ill. c. 27.

would be satisfied with moneys to which the carrier, as between it and the insured, would be entitled. It is settled by controlling authority that a common carrier has an insurable interest in the goods he carries, and can contract for the benefit of insurance effected by the owner. Van Natta v. Mutual Security Ins. Co., 2 Sandf. 490; Chase v. Washington Mut. Ins. Co., 12 Barb. 595; Mercantile Mut. Ins. Co. v. Calebs, 20 N. Y. 177; 2 Pars. Ins. 200.

In Savage v. Corn Exchange Ins. Co., 36 N. Y. 655, it was held that, a common carrier being bound to make safe delivery of goods at the place of destination, such obligation, together with his claim for advances and freight, gives him an insurable interest to the extent of the fair value of the property insured. Coming, then, directly to the point in issue, a test of the validity of this stipulation would seem to be, could the carrier recover for a loss happening confessedly through his negligence, upon a contract of insurance, insuring against perils of the sea? Upon this question, counsel for libellant lay down the proposition that negligence of a carrier or ship owner, if it can be insured against at all, must be made the subject-matter of express contract which cannot admit of a reasonable doubt. Formerly, this was a vexed question in the courts, but it is now fully and firmly settled by both English and American decisions, that a loss whose proximate cause is one of the enumerated risks in the policy, is chargeable to the underwriter, although the remote cause may be traced to the negligence of the master and mariners. Patapsco Ins. Co. v. Coulter, 3 Pet. [28 U. S.] 222; Columbia Ins. Co. v. Lawrence, 10 Pet. 507; General Mut. Ins. Co. v. Sherwood, 14 How. [55 U. S.] 351; Copeland v. New England Marine Ins. Co., 2 Metc. (Mass.) 432; and cases cited in these decisions.

In the case of General Mut. Ins. Co. v. Sherwood, 14 How. [55 U. S.] 351, it was held that damages decreed by a court of admiralty to be a lien on the vessel insured, by reason of a collision produced by the negligence of those who navigated the vessel, cannot be recovered under a policy insuring against the usual perils and including barratry. The facts were peculiar. The plaintiffs in the action were the owners of a brig. Through the negligence of the master and mariners of the brig, another vessel was injured. In proceedings on the part of the injured vessel, the brig and her owners were adjudged liable for the damages, and the decree pronounced the collision to have occurred in consequence of the negligence. On payment of the decree, the owners of the brig sued the insurance company on a time policy, and set up the facts, expressly alleging the negligence as the reason why they had paid the damages, and it was held they could not recover. It was therefore not the case of the insurers going behind the cause of loss and defending, by showing that this cause was produced by negligence, which Mr. Justice Curtiss says could not be done, but it was the case of the insured himself going behind the collision and showing, as the sole reason why he had paid the loss, the negligence of his own servants and agents.

In Copeland v. New England Marine Ins. Co., 2 Metc. (Mass.) 432, Chief Justice Shaw, in a very exhaustive opinion, containing a lengthy review of the authorities, held that "a vessel which is insured on a voyage out and home, and which departs with officers and a crew competent for the voyage, does not become unseaworthy by reason of the master's becoming incompetent, at the foreign port, to command the vessel; and if the vessel sails from such port under his command, and is lost on the homeward passage, the underwriters are not discharged, although the loss may have been caused by the master's incapacity. And although, in such case of the master's incompetency, it is the duty of the mate to take command of the vessel, and although he has a right to resort to all lawful means to establish himself in the command, yet if from want of judgment, or even from culpable negligence, he omits so to do, and the vessel sails under the master's command, and is stranded, the underwriters are not discharged." And in the opinion there is this enunciation of the law which is specially pertinent: "It is very clear in this case, that the immediate cause of the loss, was stranding in the night time, which is one of the perils insured against, and the case supposed is, that this was occasioned by the default of the mate in not assuming the command. The default must consist, either in a want of judgment in perceiving and determining that the master had become so deranged or incapacitated as to authorize and require him to interpose, or in negligence in the performance of his duty, when the case occurred. Such a case may occur in every voyage, and must be considered as one of the contingencies incident to navigation. It may often present questions of great difficulty, in acting on which, mistakes, on the part of the officer second in command, may occur. But we cannot perceive why the duty of the mate was not of a purely official and professional character, growing out of his powers and the relation in which he stood as an officer, and not devolving on him as the agent of the owners, in any other sense than that in which pilots and all other officers and mariners are their agents. They are vested with certain powers to be exercised for the use and benefit of owners, freighters, underwriters, and all others who are directly or remotely interested in the vessel and voyage. I cannot distinguish the negligence of the mate, in the case supposed, from his failure in the performance of any other duty as a nautical man. Suppose a case of a loss by stranding, and it could be satisfactorily proved, that if, in a particular

emergency, sail had been made or taken in, if an anchor had been carried out or the vessel put on another tack, the disaster might have been avoided, it would indicate a similar mistake of judgment or neglect of duty on the part of the commanding officer as that in the case supposed. In both cases, it is a mistake or neglect of his peculiar and appropriate duty as an officer and seaman. For the performance of these duties, we are of opinion that the owners, as between themselves and the underwriters, are not responsible. A contrary doctrine would lead to questions of great difficulty, involving numerous questions of fact of very difficult proof, as to the skill and seamanship of all the nautical measures taken in the whole conduct of the voyage. Besides, these mistakes of judgment and instances of negligence are incident to navigation, and constitute a part of the perils that attend it; and they can no more be restrained, prevented, or guarded against, by the owners, than by the underwriters. The most cautious foresight can only enable owners to provide a competent crew of officers and seamen at the commencement of the voyage. What reasons, then, are there of justice or policy, what considerations growing out of the nature of this contract, or the relations of the parties, which should prevent the owners from insuring themselves against this peril?"

Stranding is a peril of the sea. In the case at bar, the stranding of the vessel was the proximate cause of the loss. The remote cause was the negligence of the master and mariners in navigating the vessel. The law being as stated, it follows, that if the case were that of insurance in favor of the carrier against the perils of the sea, the insurer could not go behind the proximate cause of the loss and defeat a recovery by showing the negligence of the master and crew of the vessel. We have, then, this state of case: The carrier made itself liable for the loss of the cargo by a peril of the sea, if negligence co-operated in causing the loss. The owners of the cargo contracted with the carrier that if loss should occur for which liability arose, the carrier should have the benefit of any insurance on the property. The shippers then contracted for insurance against the usual perils. There was a loss for which the carrier was primarily liable to the shippers. The proximate cause of the loss was a peril of the sea. It was a loss, therefore, which the carrier could directly insure against, and the fact that its remote cause was negligence would not relieve the insurer. Why could not the carrier secure, by the indirect way of a contract with the shippers, in case of its liability for a loss, the benefit of their insurance, if it could by direct contract with the insurer have obtained indemnity against loss caused proximately by a peril insured against, but remotely by its own negligence? If it be said that the rights of the insurance company ought not to be affected by a contract between the shipper and the carrier, I think it may be answered that the company put itself in privity with such contract by its contract of insurance while the property was in transit, and that it dealt with the insured property, subject to the terms of the bills of lading, which gave to the carrier the benefit of the insurance in case of loss for which the carrier should be liable. The case does not show that any fraud was intended by the carrier in making this stipulation with the shippers. The agent of the insurance company was also the agent of the carrier, and the same person issued the certificate of insurance and made the contracts of shipment with the shippers. And in the light of all the facts and the legal principles which I have endeavored to state, I cannot bring my mind to any other conclusion than that this was a lawful and valid contract. If this be so, then upon receiving payment for their losses from the insurer, the right of the insured to proceed against the carrier was determined, and no such right remained to which the insurer could be subrogated, because necessarily the insurer must take the rights of the owners of the cargo subject to all agreements and equities between the insured and the carrier. Mercantile Mut. Ins. Co. v. Calebs, 20 N. Y. 173.

[On appeal to the circuit court this decision was affirmed. Case unreported. An appeal was then taken to the supreme court, where the decree of the circuit court was affirmed. 117 U. S. 312, 6 Sup. Ct. 1176.]

---

PHOENIX INS. CO. (HALLET v.). See Case No. 5,958.

PHOENIX INS. CO. (HURTIN v.). See Case No. 6,941.

PHOENIX INS. CO. (HYDE v.). See Case No. 6,973.

PHOENIX INS. CO. (IDE v.). See Case No. 7,001.

PHOENIX INS. CO. (JOHNSON v.). See Case No. 7,405.

PHOENIX INS. CO. (McKIM v.). See Case No. 8,862.

PHOENIX INS. CO. (SCHOLLENBERGER v.). See Case No. 12,476.

PHOENIX INS. CO. (VALE v.). See Case No. 16,811.

PHOENIX INS. CO. (VAN AVERY v.). See Case No. 16,829.

PHOENIX IRON CO. (KEYSTONE BRIDGE CO. v.). See Case No. 7,751.

PHOENIX MUT. LIFE INS. CO. (BROOKS v.). See Case No. 1,960.

PHOENIX MUT. LIFE INS. CO. (CONVER v.). See Case No. 3,143.

PHOENIX MUT. LIFE INS. CO. (SINCLAIR v.). See Case No. 12,896.

PHOENIX MUT. LIFE INS. CO. (WATTS v.). See Case No. 17,294.

PHOENIX MUT. LIFE INS. CO. (WHITCOMB v.). See Case No. 17,530.